UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

Pedro Manuel ROSARIO,

                                  Plaintiff,

                     -against-

CITY OF NEW YORK, et al.,

                                  Defendants.

------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/9/13

11-CV-09008 (PAC)(SN)

**REPORT AND
RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE PAUL A. CROTTY:**

 *Pro se* plaintiff Pedro Manuel Rosario ("Rosario") brings this action pursuant to Title VII

of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), the Age

Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621, *et seq.* ("ADEA"), and the

Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101, *et seq.* ("ADA"). Rosario alleges

that he was discriminated against because of his color, national origin, age, and disability. He

further alleges that he was subject to a hostile work environment and retaliation.

 Rosario sues five defendants: the City of New York (the "City"), the New York City

Department of Housing Preservation and Development ("HPD"), Simon Bonanno ("Bonanno"),

Frank Richards ("Richards"), and Peter DiMucci ("DiMucci"). These defendants have moved to

dismiss Rosario's complaint pursuant to Rules 12(b)(5) and (6) of the Federal Rules of Civil

Procedure. Consequently, the Court must determine whether service of process was timely

effected and, if so, weigh the plausibility of Rosario's allegations and determine to what extent

the defendants may be tied to the alleged discrimination. Because I conclude that Rosario has

timely served all defendants or demonstrated good cause for the failure to serve the City within

120 days, I recommend that defendants' 12(b)(5) motion be DENIED. But Rosario has not stated

a plausible claim under any theory of discrimination, and therefore I recommend that defendants'

12(b)(6) motion be GRANTED on all claims.

## FACTUAL BACKGROUND

The following facts are assumed to be true for the purposes of this motion to dismiss.

Rosario is a Housing Inspector for HPD. (Rosario Complaint ("Compl.") at 2; Exhibit

("Ex.") F at 1.)[1] In his complaint, he alleges discrimination based on unequal terms and

conditions of employment, retaliation, failure to accommodate his disability, and a hostile work

environment. (Compl. at 2-3.) Rosario also makes various claims not relevant to this matter:

describing potential violations of internal HPD policy, administrative errors, mistakes and a

general favoring of office workers over field workers. **(**Compl. at 10-12; Ex. A at 3-5; Ex. D at 5-

8.)

## I.      Discrimination Based on Title VII

Rosario alleges that he is "being treated differently th[a]n other co-workers in [his office]

because of discrimination" based on his national origin ("Hispanic") and skin color ("Melado").

(Compl. at 3.) Rosario's pleadings suggest two potential instances of discrimination because of

his color or national origin, and resulting harassment following the second instance. (Id. at 10-

12.)

---

[1] Rosario's complaint consists of a standard "Complaint for Employment Discrimination" form as well as various other attached documents. The attached forms are loosely divided into exhibits "A" – "L," although there are documents attached to the complaint before "A" and the exhibits often include multiple distinct documents. Because of this, and specifically the lack of distinct pagination or bates stamping, citations will correspond to the first page of the complaint or the first page of the exhibit, without regard to the actual page number on the cited document. "Compl. at 3," or "Ex. F at 3," for example, would correspond to the third page of that group of papers, starting respectively at the first page of the complaint or the page marked "Ex. F."

The first instance occurred "[six] or [seven] years ago." (Compl. at 11; Ex. D at 4.) Chief Inspector Richards called Rosario to his office, alone, and described a phone call he had received where a woman complained that her purse was stolen. (Id.) Rosario first asked if the woman had identified him as the thief, and when Richards said no, Rosario asked if Richards was trying to suggest that he had stolen her purse. (Id.) Based on this conversation, Rosario alleges he was signaled out because he is Hispanic, in part because Richards had assumed a white inspector had not stolen the purse. (Id.)

The second instance occurred on April 20, 2010, when Rosario was accompanied by Deputy Chief Inspector Bonanno on a "block and lot" inspection of 327 East 108th Street. (Compl. at 10; Ex. D at 3.)[2] On this trip Bonanno, whom Rosario states "is a racist and vengeful person," (Compl. at 10; Ex. D at 4), asked Rosario if he could find him a "hot girl" (Compl. at 10; Ex. D at 3). In his Equal Employment Opportunity Commission ("EEOC") Intake Questionnaire, Rosario clarifies that he was asked to "get [Bonanno] a [H]ispanic female." (Ex. F. at 5.) Rosario declined to do so and, because of this, Bonanno retaliated against him in "different ways." (Compl. at 10; Ex. D at 3.)

On August 12, 2010, Bonanno told Rosario that he had to reassign a person to the field and chose Rosario, saying Rosario was "the scapegoat." (Ex F. at 5; see Compl. at 10.) Rosario, however, also requested to be assigned to the field to accommodate his back, hip, and knee pain. (Ex. F at 5; Ex. K at 3-5; Ex. L at 4-6; see Compl. at 3.) On September 28, 2010, Bonanno "tried to force [Rosario] to stay in" the office against his doctor's orders. (Ex. F at 5; Ex. K at 1; Ex. L

---

[2] Rosario also alleges that "it started on [February 4, 2010] with [his] De[p]uty Chief — Simon Bonanno," but he does not specify what "it" was that started then. (Compl. at 9.)

at 2.)[3] On the same day, Rosario contacted his union and informed his Equal Employment Opportunity ("EEO") representative about the "hot girl" request. (Ex. D at 3.)

Bonanno began assigning Rosario to inspection routes in downtown and midtown Manhattan. (Compl. at 10; Ex. D. at 3.) Bonanno told Rosario's supervisor, DiMucci, to keep Rosario working downtown. (Compl. at 10; Ex. D at 3; Ex. F at 7.) This was a more difficult assignment for Rosario because he did not speak Chinese, but often was stationed in Chinatown. (Compl. at 10; Ex. D at 3.) He did, however, speak Spanish and felt singled out as "one of few Spanish speaking inspectors" who did not work in a predominately Spanish-speaking area. (Id.)[4] Other inspectors also were rotated between locations, but Rosario usually was assigned to work the same downtown and midtown areas. (See Ex. A at 4; Ex. F at 7.) This imposed an economic hardship on Rosario because of "soaring gas prices." (Ex. F at 7.) There potentially also are some indications that, because of his assignment, he had restricted overtime opportunities. (See Ex. A at 4; see also Ex. D at 8.)

At an unspecified time, Bonanno told Rosario to check if certain "violations in a particular building were removable." (Compl. at 10; Ex. D at 4.) When Rosario found that they were not, Bonanno nonetheless had them "removed." (Id.) On October 14, 2010, Rosario conducted a "dismissal request" at "170 Vermilyea Avenue," where the manager mentioned "at least 10-15 times" that he was friendly with Bonanno, and that they would have a conversation later in Bonanno's office. (Id.)

---

[3] Elsewhere, Rosario pleads that Bonanno "tried to [override Rosario's] doctor's orders" by sending him to the field. (Compl. at 10.) It seems likely that Rosario meant to plead that Bonanno tried to force Rosario to stay at the office, an interpretation consistent with the rest of the record and Rosario's request to be reassigned to the field. (Ex. F at 5; Ex. K at 1; Ex. L at 2.)

[4] Rosario poses a rhetorical question, asking "[h]ow would the public see it if one of the few Spanish speaking inspectors on Tour 1 is not working in an area that speaks predominantly Spanish." (Id.)

On two occasions, Rosario's supervisor, DiMucci, sent Rosario emails that established policies directed at Rosario. (Compl. at 11; Ex. A at 3; Ex. D at 8.) The first created laptop procedures just for him. (Compl. at 11.) On January 4, 2011, DiMucci emailed Rosario because Rosario had ventured into the field without a laptop and without informing anyone that he was doing so. (Ex. A at 6; Ex. C at 1.) DiMucci explained that, in the future, Rosario would have to find a supervisor to assign him a laptop. (Id.) On that same day, Rosario emailed DiMucci back, complaining that he had attempted to find DiMucci, explaining that on prior occasions other supervisors had refused to assign him a laptop and asking for a written copy of official procedure. (Ex. A at 7; Ex. C at 2.)

On January 31, 2011, Bonanno followed-up with Rosario by email, writing that he had requested that Rosario conduct the day's inspection with a laptop, but Rosario had refused and left without a laptop, having objected to the use of a laptop when no one else had to use one. (Ex. A at 9.) Bonanno explained that this was not Rosario's decision to make, and he warned that future refusals would lead to disciplinary action. (Id.) In reply, Rosario stated that he would not tolerate being treated as a child and reiterated his view that this was part of ongoing retaliation. (Ex. A at 10; see Ex. A at 8.) He did not, however, explain the supposed reason for the alleged retaliation.

The second policy was explained to Rosario in a February 3, 2011 email from DiMucci. (Ex. B at 1; see Compl. at 11; Ex. A at 5.) In this email, DiMucci asked Rosario to secure his radio in his locker after Rosario had left it in its charger. (Ex. B at 1.) Rosario replied by email that the radio was government property, and therefore the office should provide a space to store it. (Ex. B at 2.) He also expressed his worry that storing the radio in his locker would make it his responsibility. (Id.) On February 7, 2011, Rosario again emailed — and requested a written copy

5

of any directive describing office policy regarding radio storage. (Ex. B at 3.) On February 10,

2011, Richards sent a departmental memorandum to all inspectors and staff that outlined the

Department's policy regarding radio storage and use. (Ex. B at 4.)

       In his complaint, Rosario also alleges, generally, that Richards gives "compensation [and

overtime]" only to individuals "from [Richards's] country as well as those from the West

Indies." **(**Compl. at 11; Ex. D at 4.) Rosario also alleges that Richards has shown him "no

respect, courtesy and no concern whatsoever," focusing specifically on an incident when Rosario

requested leave because he needed to pick up his sick step-daughter from school, and Richards

did not "want to hear it." (Compl. at 11; see Ex. D at 6; Ex. F at 6.)

## II.    Discrimination Based on ADA

       Rosario alleges that defendants have discriminated against him by failing to

accommodate his disability — "c[h]ronic back, hip and knee pain." (Compl. at 1-3.) On or about

August 20, 2010, Rosario was told by Bonanno that he was being reassigned to the field,

effective on August 23, 2010. (Ex. J at 7; see Ex. J at 2.) In a September 20, 2010 letter to the

president of his union's local, Rosario stated that his assignment to fieldwork had "worked out

well for [his] medical conditions." (Ex. J at 2.)

       On September 28, 2010 Bonanno "tried to force [Rosario] to stay in" the office against

his doctor's orders. (Ex. F at 5; Ex. K at 1; Ex. L at 2.) Because of this, Rosario contacted his

union, which told him to contact his EEO officer. (Ex. D at 2-4; Ex. F at 5.) Rosario called his

EEO Officer and made a reasonable accommodation request to continue working in the field.

(Ex. F at 5; Ex. K at 3-5; Ex. L at 4-6.) This request was granted on September 30, 2010, when it

was explained in a memo that he would be assigned fulltime field duties as an accommodation,

but that he still was required to enter routine data entry at the office and attend training sessions and other meetings. (Ex. K at 6; Ex. L at 1; see Ex. F at 5.)

## III.    Procedural History

Rosario filed a charge of discrimination with the EEOC on February 4, 2010. (Compl. at 8; see Ex. D at 1-8.) On or about September 15, 2011, the EEOC issued a Notice of Right to Sue letter. (Compl. at 5-7; Ex. G at 1-5; cf. Compl. at 4.) On December 9, 2011, Rosario filed this suit, and on January 4, 2012, the Honorable Paul A. Crotty referred the case to a magistrate judge for general pretrial supervision and dispositive motions requiring a report and recommendation. On July 20, 2012, defendants moved to dismiss Rosario's complaint. On October 24, 2012, the case was reassigned to my docket. The motion was fully briefed on November 29, 2012.

## DISCUSSION

Defendants argue that Rosario's complaint should be dismissed because: (1) Rosario's service of summons and complaint upon defendants was defective; (2) Rosario cannot sue individual defendants under the federal statutes cited in his complaint; (3) Rosario's ADEA claim is barred because it was not presented to the EEOC; and (4) Rosario's complaint fails to state a plausible claim for discrimination and retaliation.

## I.    Service of Process

Defendants have moved to dismiss Rosario's claims for insufficient service of process. See Fed. R. Civ. P. 12(b)(5). "Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." Dynegy Midstream Servs. v. Trammochem, 451 F.3d 89, 94 (2d Cir. 2006). Rule 4(c)(1) of the Federal Rules of Civil Procedure requires that a "summons must be served with a copy of the

complaint." Service must be made within 120 days of the filing of the complaint. <u>See</u> Fed. R. Civ. P. 4(m). Rule 4(m) provides, in pertinent part, that:

> [i]f a defendant is not served within 120 days after the complaint is filed, the court — on motion or on its own after notice to th e plaintiff — must dism iss the action without prejudice against the defendant or   order that service  be made  within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

<u>Id.</u>

 "For plaintiffs proceeding <em>in forma pauperis</em> . . . , the [Marshals Service] — not the plaintiff — is primarily responsible for effecting service." <u>Sidney v. Wilson</u>, 228 F.R.D. 517, 523 (S.D.N.Y. 2005); <u>see</u> 28 U.S.C. § 1915(d) ("The officers of the court shall issue and serve all process, and perform all duties in such cases.").

Defendants argue that Rosario failed to execute timely service of summons and complaint within 120 days of the filing of his complaint on December 9, 2011. An examination of the docket, however, shows that Rosario was not granted <em>in forma pauperis</em> status until December 15, 2011. (Doc. No. 4.) An order of service then was issued by Judge Crotty on January 4, 2012, directing that a summons be issued, and that service of the summons and complaint be effected "within 120 days of the issuance of the [s]ummons." (Doc. No. 7.) A summons was issued the following day, on January 5, 2012. Thus, the deadline for proper service was May 5, 2012, and not April 7, 2012. <u>Richardson v. City of New York</u>, 11 Civ. 5733 (TPG), 2012 WL 4718623, at *2 (S.D.N.Y. Sept. 27, 2012) (determining 120 day period for service from order of service). HPD was served with the summons and complaint on May 2, 2012, (Doc. No. 12), Richards was served on April 27, 2012, (Doc. No. 15), and Bonanno was served on April 30, 2012 (Doc. No. 16). Although there is no mention in the docket of service on DiMucci, it seems more likely than not that the April 27, 2012 service of summons and complaint on "Rosario," actually refers to

8

service on "DiMucci." (Doc. No. 13.) Accordingly, service of these defendants was within 120 days of the issuance of the summons and was therefore timely.

The Marshals did not, however, serve the City with the summons and complaint until May 22, 2012. (Doc No. 14.) But Rosario provided sufficient identification to allow service when he specifically named the City in his complaint. (Compl. at 1.) The Marshals Service should have been able to serve this municipal defendant timely just as it did all other defendants. In fact, the Court has inquired and confirmed that all of Rosario's USM-285 forms for service were received by the Marshals Service on April 16, 2012. Rosario therefore "provided the Marshals with sufficient information to locate and serve [the City]; any delays in service following [his] provision of process to the Marshals should be attributed to the Marshals, not to [Rosario]." Meilleur v. Strong, 682 F.3d 56, 64 (2d Cir. 2012). Accordingly, good cause under Rule 4(m) was established when the Marshals Service failed to effect timely service upon the City. Kavazanjian v. Rice, 03 Civ. 1923 (FB)(SMG), 2005 WL 1377946, at *2 (E.D.N.Y. June 6, 2005) (collecting cases); see also Meilleur, 682 F.3d at 61 ("district courts have discretion to grant extensions [of time under Rule 4(m)], and may do so even in the absence of good cause") (internal quotation marks and citation omitted). Because there was good cause for the failure to serve the City before the 120-day service deadline, and because all the other defendants were timely served, defendants' Rule 12(b)(5) motion to dismiss should be denied.[5]

---

[5] If good cause had not existed for Rosario's failure to serve the City, the Court would construe Rosario's claims against HPD (which was served with summons and complaint in a timely fashion) as against the City. Sanders v. N.Y.C. Dep't of Hous. Pres. and Dev., 09 Civ. 4054 (RMB)(AJP), 2010 WL 3025651, at *1 n.1 (S.D.N.Y. July 28, 2010) (construing claims against HPD as against City).

## II.     Claims Against Individual Defendants and City Agency

Rosario brings suit against Bonanno, Richards, and DiMucci under Title VII, the ADA, and the ADEA. (Compl. at 1.)[6] But supervisors are not individually liable under these three statutes. Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 608 n.8 (2d Cir. 2006) (individual defendants cannot be held personally liable under Title VII); Spiegel v. Schulmann, 604 F.3d 72, 79-80 (2d Cir. 2010) (individual defendants cannot be sued under retaliation provision of ADA); Parker v. Metro. Transp. Auth., 97 F. Supp. 2d 437, 452 (S.D.N.Y. 2000) (individual defendants cannot be sued under ADEA). Individual defendants Bonanno, Richards, and DiMucci, therefore, must be dismissed from the action.

Agencies of the City also are not suable entities, and therefore, HPD must be dismissed from the action. Bind v. City of New York, 08 Civ. 11105 (RJH), 2011 WL 4542897, at *20 (S.D.N.Y. Sept. 30, 2011) (dismissing HPD because it is not a suable entity); see Dove v. Fordham Univ., 56 F. Supp. 2d 330, 337 (S.D.N.Y. 1999) "[O]rganizational subdivisions of the City of New York lack independent legal existence and are not suable entities.").

## III.     Failure to Exhaust Administrative Procedures Under ADEA

Defendants argue that the Court does not have jurisdiction over Rosario's age discrimination claim because the claim was not included in his EEOC charge and is not reasonably related to any claims in his charge. In ADEA claims, administrative exhaustion is ordinarily required before filing suit. Malarkey v. Texaco, Inc., 983 F.2d 1204, 1208 (2d Cir. 1993); Musaji v. Banco do Brasil, 10 Civ. 8541 (RJH), 2011 WL 2507712, at *6 (S.D.N.Y. June 21, 2011). A plaintiff typically may raise in a federal court complaint "only those claims that

---

[6] Rosario does not allege discrimination under state or local law, which permits claims against supervisors. While ordinarily the Court would infer such claims on behalf of a *pro se* litigant, it need not do so when dismissal of the federal claims is proper. 28 U.S.C. § 1367(c)(3).

either were included in or are 'reasonably related to' the allegations contained in [the] EEOC charge." Holtz v. Rockefeller & Co., 258 F.3d 62, 83 (2d Cir. 2001) (quoting Butts v. City of New York Dep't of Hous. Pres. Dev., 990 F.2d 1397, 1401 (2d Cir. 1993)); Musaji, 2011 WL 2507712, at *6; see also Marshall v. N.Y.C. Bd. of Elections, 322 F. App'x 17, 18 (2d Cir. 2009) (applying administrative exhaustion doctrine to complaint filed with New York City Commission on Human Rights).

In examining Rosario's complaint, it is clear that although he checked the box for a claim pursuant to the ADEA, (Compl. at 1), he did not allege any facts relating to age discrimination and did not even check the age discrimination box when provided with the opportunity on page three of his complaint (Compl. at 3). Indeed, Rosario acknowledges in his opposition papers that he checked the age discrimination box in error. (Plaintiff's Opposition Brief ("Pl. Br.") at 2.) Accordingly, Rosario's ADEA claim should be dismissed for failure to exhaust administrative remedies. Trivedi v. N.Y.S. Unified Court Sys. Office of Court Admin., 818 F. Supp. 2d 712, 737 (S.D.N.Y. 2011) (adopting report and recommendation; "mere fact that [plaintiff] checked the box for religious discrimination does not entitle him to pursue that claim in [a federal] forum since it is not one that the EEOC could reasonable have been expected to pursue based on his allegations"); see also Cooper v. Xerox Corp., 994 F. Supp. 429, 436 (W.D.N.Y. 1998) ("merely checking a box[,] or failing to check a box, does not necessarily control the scope of the charge").

## IV.   Allegations of Discrimination

Rosario alleges color or national origin discrimination under Title VII, a hostile work environment, failure to accommodate under the ADA, and retaliation. Defendants have moved to dismiss these claims pursuant to Rule 12(b)(6).

11

**A.  Standard of Review**

In considering a motion to dismiss pursuant to Rule 12(b)(6), a court must take "factual allegations [in the complaint] to be true and draw[] all reasonable inferences in the plaintiff's favor." Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009) (citation omitted). An "employment discrimination plaintiff need not plead a prima facie case of discrimination." Bermudez v. City of New York, 783 F. Supp. 2d 560, 575 (S.D.N.Y. 2011) (quoting Swierkiewicz v. Sorema N. A., 534 U.S. 506, 515 (2002)). But the plaintiff must allege sufficient facts that show an entitlement to relief. See, e.g., Alleyne v. Am. Airlines, Inc., 548 F.3d 219, 221 (2d Cir. 2008); see also Leibowitz v. Cornell Univ., 445 F.3d 586, 591 (2d Cir. 2006). The elements of a *prima facie* case can help "provide an outline of what is necessary to render [a plaintiff's employment discrimination] claims for relief plausible." Sommersett v. City of New York, 09 Civ. 5916 (LTS)(KNF), 2011 WL 2565301, at *5 (S.D.N.Y. June 28, 2011). Accordingly, "courts consider these elements in determining whether there is sufficient factual matter in the complaint which, if true, gives [d]efendant a fair notice of [p]laintiff's claim[s] and the grounds on which" they rest. Murphy v. Suffolk County Cmty. Coll., 10 Civ. 0251 (LDW)(AKT), 2011 WL 5976082, at *5 (E.D.N.Y. Nov. 29, 2011) (citation omitted). The burden on a plaintiff "at this preliminary stage" remains, nonetheless, *de minimis*. Trivedi, 818 F. Supp. 2d at 738 (citing Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001)).

Moreover, *pro se* litigants "are entitled to a liberal construction of their pleadings," and therefore their complaints "should be read to raise the strongest arguments that they suggest." Green v. United States, 260 F.3d 78, 83 (2d Cir. 2001) (citation and internal quotation marks omitted).

In determining the sufficiency of a complaint, the Court may consider "the factual allegations in [the] . . . complaint, . . . documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, [and] documents either in plaintiffs' possession or of which the plaintiffs had knowledge and relied on in bringing suit." Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993).

**B.  Color or National Origin Discrimination**

Rosario fails to plead a plausible theory of discrimination based on his color or national origin. In determining whether a claim for employment discrimination survives a motion to dismiss, the Court is guided by the elements of a *prima facie* case. These are: (1) membership in a protected class; (2) qualification for the position; (3) suffering of an adverse employment action; and (4) circumstances giving rise to an inference of discrimination. Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000). Rosario has not plausibly alleged this fourth element.

Rosario claims that his supervisor Bonanno asked Rosario to procure a Hispanic woman for him. Four months after Rosario refused to do so, Bonanno reassigned him to work in midtown and downtown. This negatively affected Rosario because: (1) he was forced to spend more money on gas; (2) he potentially lost opportunity for overtime; (3) other Spanish-speaking inspectors were allowed to work in Spanish-speaking neighborhoods; and (4) other inspectors were rotated to different neighborhoods on a semi-monthly basis. Bonanno then created, and forced Rosario to comply with, laptop and radio procedures that no other inspector had to follow.

Rosario's claim fails because he has not pled any connection between these alleged adverse actions and discrimination based on his national origin or color. Rosario has not pled that anything that happened to him at work was because of his national origin or color. Absent from

the complaint are any facts surrounding the alleged adverse action from which the Court can plausibly infer that the action was a consequence of discriminatory animus. Rather, the narrative is that Bonanno made an inappropriate solicitation that was rejected by Rosario, and that in retaliation for that rebuff, Bonanno imposed unfavorable terms and conditions on Rosario's employment. Although such conduct is inappropriate in the workplace, it is not prohibited by Title VII. See Krasner v. HSH Nordbank AG, 680 F. Supp. 2d 502, 513 (S.D.N.Y. 2010) (Lynch, C.J., sitting by designation) ("Title VII does not prohibit employers from maintaining nasty, unpleasant workplaces  . . . . [r]ather, it prohibits employers from discriminating against an employee . . . because of such individual's [protected status]"; "The prohibited causal factor requirement thus flows directly from the text of Title VII, and from the very essence of its nature as an anti-discrimination law.") (emphasis in original).

If, as the Court suspects, Rosario believes that it was because of his Hispanic origin that Bonanno made the solicitation in the first place, and thus the retaliatory conduct that followed is linked to his national origin or color, he has failed to allege as much. Rosario does not allege that Bonanno asked him to find a Hispanic woman because of Rosario's national origin or color. The Court expresses no opinion on whether such facts, if pled, would state a claim under Title VII.

Because the facts alleged do not plausibly give rise to an inference of national origin or color discrimination, Rosario's Title VII claim fails. See Williams v. Addie Mae Collins Cmty. Serv., 11 Civ. 2256 (LAP), 2012 WL 4471544, at *4 (S.D.N.Y. Sept. 27, 2012) ("Because [plaintiff's] complaint and pleadings do not demonstrate any facially plausible nexus between her protected characteristics and [defendant's] failure to hire her, her claims of discrimination based on age and race must be dismissed."); Ortiz v. Standard & Poor's, 10 Civ. 8490 (NRB), 2011 WL 4056901, at *4 (S.D.N.Y. Aug. 29, 2011) ("Without actual facts demonstrating

discriminatory animus, discrimination is just one possibility for [defendant's] actions — as such, plaintiff's claim that he was terminated for discriminatory reasons may be conceivable, but it is certainly not plausible.").

Rosario also states that Richards **allows compensation and overtime only to individuals from Richards's country and the West Indies. (**Compl. at 11; Ex. D at 4.) Liberally interpreted as a request for relief, this allegation fails to state a claim for discrimination because Rosario has not pled that he was affected by Richards's alleged discrimination. Krasner, 680 F. Supp. 2d at 514 ("The [Title VII] inquiry is an individualized one: 'courts have consistently emphasized that the ultimate issue is the reasons for the individual plaintiff's treatment, not the relative treatment of different groups within the workplace.'") (emphasis in original) (quoting Brown v. Henderson, 257 F.3d 246, 252 (2d. Cir. 2001)).

## C.  Hostile Work Environment

Rosario alleges that a hostile work environment has been established by the various statements made to him, the laptop and radio policies directed at him, and the inconsistencies in his field assignments. (See, e.g., Ex. J at 2-4.) This conduct was not sufficiently pervasive, and did not include offensive language or physical contact, and therefore fails to establish a plausible hostile work environment. Moreover, Rosario has not pled that the conduct was because of discrimination.

In determining whether a hostile work environment claim survives a motion to dismiss, the Court is guided by the elements of the *prima facie* case. "To state a claim for a hostile work environment in violation of Title VII [or the ADA], a plaintiff must plead facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive — that is, . . . creates an environment that a reasonable person would find hostile or abusive; (2) creates an

15

environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [national origin, color or disability]." Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007); Anderson v. Davis Polk & Wardwell LLP, 850 F. Supp. 2d 392, 403-04 (S.D.N.Y. 2012); see Monterroso v. Sullivan & Cromwell, LLP, 591 F. Supp. 2d 567, 584 (S.D.N.Y. 2008) ("Hostile work environment claims under the ADA are evaluated under the same standards as hostile work environment claims under Title VII.") (citation omitted).[7] A court looks to the totality of circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23(1993). "Isolated acts, unless very serious," will not sustain a hostile work environment claim. Alfano v. Costello, 294 F.3d 365, 373-75 (2d Cir. 2002).

"While the standard for establishing a hostile work environment is high," the Court of Appeals for the Second Circuit has "repeatedly cautioned against setting the bar too high." Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003). "The environment need not be unendurable or intolerable." Id. (citation and internal quotation marks omitted). "Nor must the victim's psychological well-being be damaged." Id. (citation and internal quotation marks omitted). Indeed, "the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases." Id. (citation and internal quotation marks omitted).

---

[7] Although, the Court of Appeals for the Second Circuit has not yet addressed whether the ADA provides a basis to assert a hostile work environment claim, Mohamed v. New York, 11 Civ. 6734 (BSJ), 2012 WL 3104921, at *3 n.6 (S.D.N.Y. July 31, 2012) (citing Ragusa v. Malverne Union Free Sch. Dist., 381 F. App'x 85, 88 n.3 (2d Cir. 2010)), district courts have found the ADA encompasses hostile work environment claims. Monterroso, 591 F. Supp. 2d at 584 (collecting cases).

Rosario's pleadings, when examined separately and in totality, fail to establish a hostile work environment at HPD. First, besides being time-barred, the incident when Richards questioned Rosario did not create a hostile environment. A reasonable person may feel uncomfortable being singled out for questioning because he is Hispanic. But Richards's question was not necessarily about national origin or color when divorced from the context Rosario provided, and therefore was less likely to create a hostile work environment. The remark also was not part of a pattern of discrimination directed at Rosario.

Second, the incident when Bonanno asked Rosario to procure a Hispanic woman for him also does not establish a hostile environment. Bonanno's question was in poor taste. But it was not clearly asked because Rosario was Hispanic. It also was not repeated. See Jessamy v. City of New Rochelle, New York, 292 F. Supp. 2d 498, 511-12 (S.D.N.Y. 2003) (plaintiff did not allege overtly racial conduct by defendants; "conduct that can be categorized as a few isolated incidents, teasing, casual comments or sporadic conversation will not be deemed to create a hostile work environment"); see Carter v. Cornell Univ., 976 F. Supp. 224, 232 (S.D.N.Y. 1997) (holding six racial slurs uttered over "a period of years" did not constitute hostile work environment under Title VII). Rosario must plead more than that Bonanno was a "racist and vengeful person." (Compl. at 10; Ex. D at 4); see Pacheco v. N.Y. Presbyterian Hosp., 593 F. Supp. 2d 599, 623 (S.D.N.Y. 2009) (rejecting "conclusory argument that an English-only policy can induce native speakers of Spanish to experience a work environment as hostile") (internal quotation marks and citation omitted).

Third, the employment consequences that followed Rosario's refusal to find Bonanno a Hispanic woman fail to establish a hostile environment. Some might find the requirements to work in midtown and downtown, take laptops on inspections, and store radios in lockers to be

17

tedious. A reasonable person would not find those requirements to be "hostile." Although it is

unclear from Rosario's complaint how often he was directed to follow the laptop and radio

procedures, or that he was, in fact, the only one subject to them, Rosario has not alleged that the

harassment was daily or even frequent. Cf. Terry, 336 F.3d at149 (finding hostile work

environment when purposeful harassment made plaintiff's "work environment unusually and

unnecessarily unpleasant on a nearly daily basis," including testimony that supervisor's

harassment made plaintiff's life "hell on Earth").

 Rosario also has not pled that any requirements interfered with his ability to work to the

extent required for a hostile environment claim. Cf. id. at 150 (finding harassment directly

interfered with ability to perform job as special agent by denying plaintiff firearm privileges).

Although not dispositive, this is a further factor against finding that HPD had a hostile work

environment. Id. at 149 ("Whether or not the harassment interferes with an employee's ability to

work is merely one factor to be considered when looking at the totality of circumstances to

determine whether a hostile work environment has been created.").

 Finally, Rosario's allegations of a hostile work environment under the ADA also are

implausible. Assuming as true that Bonanno "tried to force [Rosario] to stay in" the office

against his doctor's orders, (Ex. F at 5; Ex. K at 1, Ex. L at 2), or in the alternative "tried to

[override his] doctor's orders" by sending him to the field, (Compl. at 10), HPD still granted

Rosario's accommodation when requested (Ex. K at 6; Ex. L at 1; see Ex. F at 5). Rosario has

not provided any evidence that anyone at HPD subsequently discriminated against him because

of his disability — let alone to the extent necessary to create a hostile work environment.

Monterroso, 591 F. Supp. 2d at 584-85 ("demanding" standard for ADA hostile work

environment claims).

### D.  Failure to Accommodate

Rosario fails to plead a plausible claim of discrimination because of disability. In determining whether a claim for disability discrimination survives a motion to dismiss, the Court is guided by the elements of a *prima facie* case. A plaintiff must show: "[(1)] that his employer is subject to the ADA; [(2)] that he is disabled within the meaning of the ADA or perceived to be so by his employer; [(3)] that he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and [(4)] that he suffered an adverse employment action because of his disability." Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 134 (2d Cir. 2008).

Rosario's claim is not plausible because he has not pled any discrimination because of his disability. An analysis of the elements of the *prima facie* case provides further support for this point. Rosario has not shown an adverse employment action because of his disability. He alleges that defendants failed to accommodate him. (Compl. at 2.) But he was granted a reasonable accommodation in the form of "full time field duties," (Ex. L at 1), three days after he made the request (id.). Rosario acknowledges that his request was granted. (Ex. F at 5; Pl. Br. at 2.) Rosario, moreover, had already been assigned field assignments before he made his request. (Ex. F at 5; see Ex. L at 1, 4.) There is no plausible inference of a failure to accommodate.

Rosario relatedly pleads that his doctor's orders were ignored by defendants. (Compl. at 3) (because Rosario's "doctor's orders were not being enforced . . . [he] had to request reasonable accommodation"). But an employee cannot hold an employer liable for failing to provide an accommodation that the employee has not requested. Thorner-Green v. N.Y.C. Dep't of Corr., 207 F. Supp. 2d 11, 14-15 (S.D.N.Y. 2002) (citing Mazza v. Bratton, 108 F. Supp. 2d 167, 176 (E.D.N.Y. 2000), aff'd, 9 F. App'x 36 (2d Cir. 2001)). Rosario has not alleged that

defendants were aware of the need for reasonable accommodation before his request. Brady, 531 F.3d at 134-35.

### E.  Retaliation

Finally, Rosario fails to plead a plausible claim of retaliation. In determining whether a claim for retaliation survives a motion to dismiss, the Court is guided by the elements of a *prima facie* case. "[T]o establish a prima facie case of retaliation, an employee must show [(1)] participation in a protected activity known to the defendant; [(2)] an employment action disadvantaging the plaintiff; and [(3)] a causal connection between the protected activity and the adverse employment action." Richardson v. Comm'n on Human Rights & Opportunities, 532 F.3d 114, 123 (2d Cir. 2008) (Title VII retaliation); Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223 (2d Cir. 2001) (analyzing ADA retaliation case with same framework employed in Title VII cases).

As a threshold matter, it is unclear whether Rosario is alleging retaliation under the ADA, Title VII, or both. (Compare Ex. F at 2 (checking boxes for national origin discrimination and retaliation, but not disability discrimination) with Compl. at 2-3 (checking boxes for failure to accommodate disability and retaliation).) Potential claims under both statutes therefore will be analyzed; both fail because Rosario has not pled a plausible theory of retaliation.

Rosario has failed to establish a protected activity under Title VII. The term "protected activity" refers to action taken to protest or oppose statutorily prohibited discrimination. See 42 U.S.C. § 2000e-3; Cruz v. Coach Stores, Inc., 202 F.3d 560, 566-67 (2d Cir. 2000). A liberal reading of Rosario's pleadings suggest his email responses to laptop and radio procedures, as well as his letter to his union president about working in midtown, could be considered complaints. (Ex. A at 7; Ex. B. at 2; Ex. C at 2; Ex. J at 2-4.) But complaints are not protected

activities when the plaintiff is not complaining about discrimination. <u>Trivedi</u>, 818 F. Supp. 2d at

740 (complaining to union about allegedly defective testing equipment is not protected activity);

<u>Kamrowski v. Morrison Mgmt. Specialist</u>,  05 Civ. 9234 (KMK), 2010 WL 3932354, at *20

(S.D.N.Y. Sept. 29, 2010) (reporting mismanagement of coworkers and "sanitation problems"

unrelated to discrimination is not protected activity); <u>Santucci v. Veneman</u>, 01 Civ. 6644 (CBM),

2002 WL 31255115, at *4 (S.D.N.Y. Oct. 8, 2002) (plaintiff's objection to "allegedly corrupt

system of payoffs" is not protected activity); <u>Rodriguez v. Beechmont Bus Serv., Inc.</u>, 173 F.

Supp. 2d 139, 150 (S.D.N.Y. 2001) (dismissing retaliation claim premised on complaints about

worker safety). Rosario does complain in a conclusory manner that he was subject to retaliation,

retribution, and a hostile working environment. (Ex. J at 3.) But even if this is sufficient to

establish opposition to discrimination, Rosario's claim still fails because he has not pled any

adverse employment action that resulted from any of his complaints.

Rosario also fails to establish any adverse employment action that resulted from his

request for reasonable accommodation. He made the request on September 28, 2010. (Ex. F at 5;

Ex. K at 3-5; Ex. L at 4-6.) It was granted two days later. (Ex. K at 6; Ex. L at 1; <u>see</u> Ex. F at 5.)

There are no allegations of ADA retaliation after that date. Rosario's claims for retaliation fail

because they are not facially plausible, and furthermore, they cannot establish the elements of a

*prima facie* case.

## CONCLUSION

For these reasons, I recommend that defendants' motion to dismiss brought under Rule

12(b)(5) be DENIED, but the motion brought under Rule 12(b)(6) be GRANTED as to all

claims. Given Rosario's *pro se* status, I further recommend that the dismissal be without

prejudice to provide an opportunity to amend. Rosario has suggested potential adverse

employment actions by pleading that he was denied the opportunity that other inspectors had to rotate between locations and by suggesting that he was denied overtime. Should Rosario decide to amend his complaint, he must focus on connecting those alleged adverse actions to evidence of discriminatory animus.

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Paul A. Crotty at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Crotty. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

**SO ORDERED.**

_____
**SARAH NETBURN**
United States Magistrate Judge

DATED:     New York, New York
           January 9, 2013

22